Hitchcock, C. J.,
dissenting. These cases are of some considerable importance, not so much on account of the principles involved as on account of the value of the property in controversy. They were fully argued in the last term of the Supreme Court, in Hamilton county, and have again been argued at the present term of the court in bank. Although present during both arguments, yet I was necessarily absent when the cases were disposed of. Not concurring fully in the decision- made, I deem it proper to express my opinion upon the controversy.
William Irwin, the former owner of the premises in controversy, died in 1824, leaving a widow and four children, to wit: Archibald Irwin, who is a defendant in these cases ; William Irwin and James F. Irwin, the complainants in the original bill, and Louisa, intermarried with Lewis Whiteman. He also *leffc a grandson, who died in infancy. He also left a will; and Lewis Whiteman and Thomas D. Carneal were appointed his administrators, with the will annexed.
Mrs. Whiteman died in 1832, leaving three children—Harriet, William, and Louisa. Harriet intermarried with William F. Irwin, and, with her husband, is complainant in the cross-bill.
The leading facts and circumstances of the cases, as they appear *570 in the pleadings, exhibits, and testimony, are as follows: In 1821, William Irwin, the deceased, was the owner of three lots in the city of Cincinnati, and about one hundred acres of land on the hills adjoining the city; and, being in somewhat doubtful circumstances, was anxious to place this land and the lots in a situation that they could not be reached by execution. At this time he was in the mercantile business, in company with his son Archibald. He applied for counsel to Mr. Longworth, who was his intimate friend and legal adviser. Mr. Longworth advised that the property should be convoyed in trust, to indemnify Archibald for his liability upon claims against the firm of William Irwin & Son. He was informed that Archibald would not consent to this, as it might lead to a suspicion with respect to his integrity. Longworth himself urged Archibald to consent to such an arrangement, but he utterly refused.
At this time, William Irwin was indebted to Longworth, among other things, in the sum of between two and three thousand dollars, for money paid by Longworth to John Johnson, for Irwin, and for the payment of which to Longworth, Thomas D. Carneal was security; and Longworth was also indorser to the Bank of the United States for Ii’win upon several notes. These notes to the bank were secured by mortgage on real estate, which was supposed to be more than sufficient for their satisfaction.
Archibald Irwin not agreeing that the land and lots, before referred to, should be conveyed in trust for his indemnity, and hi3 father, William Irwin, being urgent that they should be placed beyond the reach of execution, it was at length agreed between *him and Mr. Longworth that the same should be conveyed to Thomas D. Carneal, in trust, to indemnify Longworth against his bank indorsements. Longworth drew the deed, which is absolute in its terms, the consideration expressed being five thousand dollars, although no consideration was actually paid. It was executed in August, 1821, and left with Longworth, to be delivered to Carneal. Longworth procured it to be recorded, but did not deliver it to Carneal until March 21, 1822.
At the time of delivery, Longworth had prepared a declaration of trust, according to the understanding between himself and Irwin, but this declaration Carneal refused to sign, or to receive the deed upon such terms, insisting that the debt due from Irwin to Longworth, upon which Carneal was security, should be provided *571 for as well as the bank indorsements. Finally, the following declaration of trust was drawn up and signed by Carneal, who received the deed:
“ This may certify that, whereas, "William Irwin has deeded to me the equal, undivided moiety of a tract of land, lying east of Cincinnati, estimated to contain two hundred acres, situated in fractional section No. 5, township 3, and fractional range 2, and also the north half of lots Nos. 1, 2, and 3, in square No. 1, in that part of Cincinnati laid off by the United States. Said conveyance has been made me in trust, for the following purpose, and no other ;• Whereas, William Irwin stands indebted to Nicholas Longworth in the sum of $2,912, for so much money paid by him for said Irwin, to John Johnson; and whereas, the said Nicholas Long-worth stands as indorser for said Irwin in the Branch Bank of the United States, in Cincinnati, to a large amount; this may therefore certify that I hold the same in trust—in the first place, to secure said Nicholas Longworth in the repayment of the aforesaid sum and interest from the date; and, secondly, to indemnify and save harmless the said Nicholas Longworth as the indorser of said Irwin; and, thirdly, the overplus to the creditors, if any, of the same William Irwin; and lastly, to account to said William Irwin, his heirs, executors, and administrators, *for the remaining balance in my hands. If said Irwin should not pay the said Nicholas Longworth the aforesaid sum of money and interest yearly, within five years from this date, and pay the several notes in the Branch Bank, on which said Nicholas Longworth is indorser, or otherwise obtain his discharge from liability in the same, I am to sell the aforesaid premises at private sale or public auction, for cash or on credit, at the discretion of the said Nicholas Longworth, and apply the proceeds in the manner heretofore pointed out. First, the private debt of the said Nicholas Longworth; secondly, the notes in the Branch Bank, on which said Nicholas Longworth is indorser of said Irwin; thirdly, to pay from the surplus, if any, other debts due by said Irwin; and, lastly, to account to said William Irwin, his heirs, executors, administrators, or assigns, for the remaining balance, if any.” Dated March 16, 1822, and signed “ Thomas D. Carneal.”
William Irwin was not present at the delivery of the deed and execution of the declaration of trust. It is pretty manifest, however, that he had authorized Longworth to transact the business, *572 -and the great effort was so to arrange it as to put the property beyond the reach of creditors. Not that William Irwin designed any actual fraud. He probably fully believed himself able to pay all his debts, provided he could have his property in a situation to dispose of it without a forced sale. And there can be no doubt that Dongworth expected to have the property reconveyed at the request of Irwin, believing that so far as the bank debts were concerned, the property mortgaged to the bank by Irwin was fully adequate to satisfy those debts.
Soon after the delivery of this deed to Carneal, Dongworth left the state upon a visit to New Jersey, and was absent for some time. During his absence, Archibald Irwin called upon Carneal, and requested of him a conveyance of the land and lots. Carneal was about to comply, when he recollected the declaration of trust executed by him to Dongworth, and went in company with Archibald to Dongworth’s house, found the writing, %nd read the same. Archibald was surprised, and so was William Irwin; but, after a little reflection, the latter remarked in substance. “It will be all right when Dongworth returns, he said it must be so fixed •as to stand in law.”
After the return of Dongworth there were several interviews between him and William Irwin, some of them of an angry character—li’win insisting that the land was only to be holden for the bank debts, which both supposed to be otherwise secure; and Dong-worth contending it was as well to secure the Johnson debt as the other. Dongworth proposed, however, that if Irwin would get him discharged from liability on the indorsements, or would secure "to him the Johnson debt, he would give up the land. This Irwin was not able to effect. At length the matter was so arranged that Dongworth agreed to give up his other claims against Irwin, and let the land remain as an indemnity on account of his indorsements. An instrument of writing was drawn by Carneal, and signed by Dongworth and Irwin, as follows:
“The real estate transferred to Thomas D. Carneal, to continue as collateral security for Nicholas Dongworth’s indemnity, as indorser of William Irwin, in the Bank of the United States, or until said Irwin releases said Dongworth from said indorsements.
“ The claim against Philips, to be assigned when judgment is obtained, to be applied to the discharge of Jabez Dongworth’s debt, due from Farmers and Mechanics’ Bank. Dongworth to give a *573 receipt from any balance due him on the amount paid for William Irwin on account of the Farmers and Mechanics’ Bank, and release said Irwin from the debt due for moneys paid Johnson, and look to the Farmers and Mechanics’ Bank for the same.”
This paper is signed by William Irwin and Nicholas Longworth, and was placed in the hands of Carneal. It is without date. It was deposited with Carneal, and remained in his possession until the year 1839, if not afterward.
Notwithstanding the execution of the deed to Carneal, *William Irwin continued in possession of the real estate during his life, and his heirs for some years after his death. William Irwin died in 1824. Some years after his death, the taxes on the hill-land being unpaid, Longworth bid it in for the unpaid taxes; but whether he received a deed from the auditor does not appear. In 1827-28, or ’29, he entered into possession of this hill-land, and has continued in possession ever since. The town-lots still continued in possession of the Irwin heirs.
After the death of William Irwin, Archibald Irwin interposed a claim that the deed executed by his father to Carneal was, in reality, in trust for his benefit, to indemnify him for the payment of debts due from the firm of William Irwin & Son; and insisted that, notwithstanding the original declaration of trust, and the subsequent memorandum signed by William Irwin and Longworth, and deposited with Carneal, he was entitled to the land. Long-worth, on the contrary, insisted that he was entitled to be indemnified for his indorsements to the Branch Bank, according to the stipulation of the before-named memorandum. This controversy between Archibald Irwin and Longworth continued from the death of William Irwin to the year 1839. There was nothing secret about it; but it was well understood by their mutual friends.. Different propositions for compromise were made through friends, but none of them complied with. These propositions were made through friends, becausp the parties were so far estranged from each other that they held no personal intercourse.
In the meantime, the property mortgaged by William Irwin to secure the notes due from him to the Branch Bank, and which had been indorsed by Longworth, was exhausted, and Longworth was compelled to pay to the bank an amount which, with interest to the year 1839, amounted to nearly twenty thousand dollars. Archibald Irwin had also paid of the debts of William Irwin & Son an *574 •amount’ nearly equal to twenty thousand dollars, and which, with interest, exceeded that sum.
Archibald Irwin, through his friend, N. Gr. Pendleton, in *order to compromise this difficulty, proposed that Longworth should take the hill-land, and suffer him, Archibald, to have the town-lots. For a long time Longworth refused to accept of this proposition, on the ground that the hill-land was not of sufficient value to indemnify him; but at length, in January, 1839, through the advice and persuasion of friends, who were anxious that this long existing feud should cease, concluded to comply with the proposition.
Carneal, the trustee, however, refused to convey according to this arrangement, unless with the consent and approbation of the heirs of "William Irwin. This was made known to Archibald Irwin, and ho drew up an instrument, which was signed by himself, his brothers William and James F. Irwin, and Lewis Whiteman, husband of Louisa J. Whiteman, and natural guardian of his and her children. This instrument is as follows:
“Whereas, on August 13, 1821, William Irwin, deceased, deeded to Thomas D. Carneal a certain lot of ground on the corner of Fourth and Ludlow streets, in the city of Cincinnati, and the undivided half of two hundred acres of land on the hills east of said •city, in trust for the use of Archibald Irwin, to discharge the debts of William Irwin & Son; and whereas, subsequently, the said William Irwin, deceased, did, by written memorandum, agree that the property aforesaid should be held for the security of Nicholas Long-worth, as his indorser to the Bank of the United States; now, know all men by these presents, that we, the undersigned, heira of William Irwin, deceased, do hereby authorize said Thomas D. Carneal to execute a deed to the said Archibald Irwin, for the lots aforesaid, and to the said Nicholas Longworth a deed for the land aforesaid, and do hereby express our free consent and approbation to the same, as heirs of said deceased. Witness our hands and seals at Cincinnati, January 11, 1839.
(Signed,) “ L. Whiteman, [l. s.]
“ J. F. Irwin, [l. s.]
“W. Irwin, [l. s.]
“ Witness: N. Morill. “A. Irwin, jh. s.] ”
*At the date of this instrument, William Irwin, the complainant, according to the testimony of Archibald Irwin, was *575 thirty-throe years old, and James E. Irwin nearly thirty-one. They were men in business, and well educated.
The testimony as to the value of the hill-land at the time is somewhat conflicting; but from all the evidence, I am satisfied that its actual value could not probably have exceeded ton thousand dol-^ lars—certainly it could not have exceeded fifteen thousand. I do not believe it could have been sold in the market for the first-named sum. The city lots were probably worth from eight to twelve thousand.
Longworth had no part in procuring the before-recited order on Carneal, and there is no proof that he ever saw it until after the execution of the deeds in pursuance of it.
This instrument or order, having been delivered to Carneal, he executed the conveyances as therein directed, on January 21,1839. The conveyance to Longworth is in the ordinary form of a quitclaim deed. In executing the conveyances, he took from the grantee’s writings, of which the following are copies:
“Deceived, January 17, 1839, from Thomas D. Carneal, Esq., a deed for the lot mentioned in the within memorandum, which I acknowledge to be in full of all claims against the estate of William Irwin, deceased, for liabilities for debts of William Irwin & Son.
Archibald Irwin.”
“I have received from Thomas D. Carneal a quitclaim deed for one hundred acres of land, more or less, east of Cincinnati, which conveyances were made me by order of the heirs of William Irwin, deceased, and which I accept in full of all claims and demands against the estate. Nicholas Longworth.
“ Cincinnati, January 21,1839.”
Indorsed on the back:
The conveyance is for the undivided half of two hundred acres, more or less.
Nicholas Longworth.”
*The complainants in the original bill seek relief, against the effect of the before-recited order upon Carneal, by them signed, and to be let in to redeem the hill-land, upon the payment to Longworth of the amount which he has been compelled to pay to the Branch Bank, upon his indorsement; and they base this application upon an alleged mistake as to their rights, at the time they signed the instrument. This alleged mistake is set forth in their amended bill, filed in November, 1845, as follows:
“Your petitioners further represent, that the recital in said in *576 strument that the said lands and tenements had been com eyed to-tho said Thomas D. Carneal, in trust for the use of Archibald Irwin, to discharge the debts of William Irwin <& Son, was utterly false in substance and in fact; that your petitioners did not know the falsehood of said recital, but the fact was well known to the said Nicholas Longworth to be, that said deed was not made for that purpose. Your petitioners pray that no effect may be given to said instrument, the same having been obtained from your petitioners upon a mistaken view of the facts, and by misrepresentation and concealment, on the part of the said Nicholas Longworth, of facts affecting your petitioners’ rights, as aforesaid; and your petitioners pray that said instrument may be declared void.”
In this charge in the bill there is no allegation, nor in any other part of the bill is there any allegation that there was any mistake or any misapprehension of the trust, so far as Longworth is concerned. It was precisely as set forth in the order upon Carneal. It is charged, it is true, that complainants had a mistaken view of the facts, in consequence of the misre|>resentation and concealment of Longworth. But where is the evidence of this misrepresentation and concealment? It is not in the case. On the contrary, the complainants have been at great pains to show that Longworth has uniformly insisted that the trust was for his benefit, and not for the benefit of Archibald Irwin. And they are conqpelled to do this in that aspect of the case in which they insist there was a mistake or misapprehension on their part.
^feut what is the position in which they place themselves-by this allegation, in connection with the prayer of their bill? They charge that they executed this instrument of writing upon the supposition that the land was conveyed to Carneal in trust for their brother Archibald, for the payment of the debts of William Irwin & Son; and that subsequently there was an agreement in-writing that Carneal should hold the land in trust, to indemnify Longworth for his indorsement to the Branch Bank. Having this impression, they were willing and consented that the hill-land should be conveyed to Longworth, and the city lots to Archibald, and directed accordingly. Now they have ascertained that there was no trust in favor of Archibald, but that it was entirely in favor of Longworth. Under these circumstances they pray, not that Archibald, who had no interest, should release to them the property which he has thus acquired through their mistake, but that *577 Longworth, who had a greater interest than they supposed, and who relinquished a part of that interest, may be decreed to hold the land which he has acquired, subject to their right of redemption. This does not seem to me like seeking equal and exact justice, but would rather appear to be a consequence flowing from that family feud, of which we hear so much' in these cases.
I have said that the application for relief is based upon the allegation that there was a mistake or a misrepresentation in this order or memorandum, in this particular; that it is therein alleged that the lands and lots were conveyed “ in trust for the use of Archibald Irwin, to discharge the debts of William^ Irwin & Son;’’ and that the complainants had no knowledge of this mistake, but supposed the fact to have been as therein represented. True, in the original bill, direct and positive fraud is charged upon Longworth; but of this there- is no proof, and in the amended bill this charge is abandoned. In argument it is said they did not know that they had any interest in the land, or any right to redeem. Put if the land had been conveyed in trust for the purpose of paying these debts, or for the purpose of indemnifying Longworth for his indorsements, the payment *of the debts, or the payment of the notes which Longworth indorsed, by the grantor or his heirs, would have relieved the land from the incumbrance, and the trustee must have rcconveyed. Had the deed of conveyance been technically a mortgage, such payment, according to the decisions of this court, would not only have released the land from the incumbrance, but would have reinvested the grantor, or his heirs, with the legal title. Such are the principles of law, as we recognize them. Although a man may be relieved in equity, where he has acted in ignorance of facts which were important for him to know, it must be an extreme case which will justify a court in relieving him on account of his ignorance of the law. Cases may arise where courts will interfere to relieve, on account of ignorance of the law; as where young and inexperienced heirs have been defrauded of their inheritance, or have been induced to convey away their inheritance without adequate compensation. But it will not be claimed that the original complainants in these cases were either very young or very ignorant, at the time they signed the order or memorandum of January, 1839. On the contrary, one of the two was thirty-three years of age, and the other more than thirty. They were both engaged in business, and had been well educated.
*578 Now, as to the falsity of tbo allegation that this deed to Carneal was made “ in trust for Archibald Irwin, to discharge the debts of William Irwin & Bon." This instrument was drawn up by Archibald Irwin himself, and as a witness he still swears that such was the fact. That there was any such trust that could be enforced in law or equity can not be protended, and the reason is, that there is no written memorandum to that effect. If there was any such trust, it was merely a parol trust; and it is not described in the order as anything more than a parol trust, while it is stated that, “ subsequently, the said William Irwin, deceased, did, by written memorandum, agree that the property aforesaid should be held for the security of Nicholas Longworth, as his indorser,” etc. It may bo well to inquire as to the real design of William Irwin in making this *doed to Carneal. It certainly was not for the purpose of securing Longworth on account of his indorsements. Long-worth did not require any such security, for he supposed that the property already mortgaged by Irwin to the bank was abundantly sufficient to pay the domairds and save him harmless. The deed was not made at his solicitation and request. On the contrary, the part by him taken in the transaction was in compliance with the expressed wishes of William Irwin. In my mind, there can be no doubt that the leading object was to put the property beyond the roach of creditors, and place it in a situation that he could control it, and with its avails, pay the debts of William Irwin & Son. The design was to benefit Archibald Irwin. It appears from the statements of Longworth, which are made evidence in the case by the complainants, that, upon the first application of William Irwin to him relative to the business, he advised that the property should be conveyed to Archibald, or that it should be conveyed to some other person, in trust for Archibald. This was declined, however, on the alleged ground that Archibald would not consent from motives of delicacy.
During the absence of Longworth in Now Jersey, Archibald applied to Carneal for a conveyance of the property; and this, too, with the assent of his father. Would he have done this unless he had supposed that he had an interest, or unless he had supposed the conveyance for his benefit ? Carneal seems, in the first instance, to have been willing to comply with this request, and'would have conveyed accordingly but for his recollection of the writing he had given to Longworth, and which seems to have made so *579 little impression upon his mind that he did not recollect its contents until he examined the writing itself. Carneal undoubtedly understood that the conveyance to him was for an object different than that expressed in the declaration of trust. This declaration of trust in favor of Longworth was intended so to fix the matter that it “would stand in law.” Longworth himself states that, notwithstanding the deed and declaration of trust, it was his expectation that Irwin *would retain the property and dispose of it as he thought proper. And if there is anything in the whole case, from which it can bo inferred that Longworth acted in bad faith toward William Irwin or his family, it consists in this, that he held on to this trust property contrary to the expectation of Irwin ; and his apology for this must be that, at the time of the transaction, he declared, as he says to Irwin, that it was to be at his election whether or not to give it up. To bring all these circumstances into considei'ation, I am of opinion that, when William Irwin made the conveyance to Carneal, he did it with the intent and expectation that Archibald Irwin would receive the benefit of the land; and that the latter, when he testifies under oath that the land was conveyed in trust for his use, to pay the debts of William Irwin & Son, is substantially correct. This opinion is strengthened by the testimony of both Archibald Irwin and Thomas D. Carneal, as to the conduct and declarations of William Irwin. The real,object was the indemnity of Archibald; but that the conveyance’ might “ stand good in law,” the ostensible one was the indemnity of Longworth for his indorsements. The former rested in parol, the latter was reduced to writing.
Longworth refusing to yield his security, there was altercation between him and William Irwin in the lifetime of the latter; and after his death, the same contention was continued between Archibald and Longworth—the former contending that the trust was for him, and the latter relying upon the original declaration of trust of 1821, and the subsequent modification in writing, which bears no dato. The former could not be enforced as resting merely in parol; but the latter, being in writing, was valid.
Had the statement, in the order of January, 1839, been that this trust in favor of Archibald Irwin was in writing, then, indeed, it' would not have been in accordance with the fact. But such is not the statement. Counsel for complainant characterize this statement as being false, as being a lie. If it were so, by whom was *580 this falsehood uttered? Not by Nicholas Longworth, but by Archibald Irwin; and because Archibald *Irwin has uttered this falsehood, they seek relief, not against him, but against Long-worth. He is excused on the ground that he really believed he was telling the truth. He did so believe, and still so believes; and I. am satisfied that he is correct in this belief, and that the only difficulty which lay in his way was, that the trust for his benefit was not reduced to writing; and the reason why it was not reduced to writing was, the apprehension that in such case the deed itself would bo held to be fraudulent as to creditors.
The complainants, insisting upon the falsity of this statement, in the order of January, 1839, say they were ignorant of this fact—■ were ignorant that they had any interest in this property; and, having ascertained their mistake, now seek relief. Having signed the order, and having done it voluntarily—certainly having done it without any influence exerted over them by Longworth, or any one acting for him—it is for them to make proof of this allegation in the pleadings. The proof made is of their respective ages at' the time of the execution of the deed to Carneal, at which time William was fifteen years of age, and James F. nearly thirteen. At the date of the order the former was thirty-three and the latter more than thirty. There is also the testimony of Archibald Lwin and Lewis Whiteman. The former states that he does not know as to their knowledge; that he never communicated with them; that he never told them that they had any interest in the land, for he did not suppose they had any, believing it in equity to belong to himself. Whiteman, who was one of the administrators of William Irwin, says that he did not suppose that they had any interest. He knew that the land had been conveyed to Carneal, and supposed the trusts to have been as sot forth in the order; that the administrators, in their accounts, took no notice of the land or the demands of Longworth and Archibald; and that he was satisfied that the property conveyed to Carneal was not sufficient in valuó to indemnify Archibald for the payment of the debts of William Irwin & Son, and to indemnify Longworth on account of his in-
dorsement to the Branch Bank. The reason why he *did not suppose these complainants had any interest was, that the properly itself was not of sufficient value to satisfy the claims, for the satisfaction of which it was pledged; and such, undoubtedly, was the opinion of the other witness.
*581 It may be well to inquire wbat knowledge, with respect to this whole transaction, these complainants did possess, and whether that knowledge was of a character to lead them to such inquiries as would have made them acquainted with, the true state of facts. If it was, it is sufficient. An individual will be charged with notice, where the circumstances of the case are such as to put a prudent and reasonable man upon inquiry.'
These complainants knew, that this land had been deeded by their father to Carneal, and that this conveyance was accompanied with a trust. Whether they knew of the controversy between their father and Dongworth with respect to this trust, after the execution of this deed, does not positively appear in the case. But it does appear in their answer to the cross-bill that they were well acquainted with the protracted controversy between their brother Archibald and Dongworth, as to which of the two were entitled to the benefit of this trust. They must have known, or at least it is reasonable to suppose they must have known, something with -respect to the particulars of this controversy. If they did not know it before, the presentation 'of the order itself gave them the information. This, at any rate, was sufficient to put them on inquiry. In this it is recited that the deed was made to Carneal in trust “for the use of Archibald Irwin, to discharge the debts of William Irwin & Son,” and that subsequently, by a written mem-orandum, William Irwin agreed that the property .should be held to indemnify Dongworth. Of the truth of the facts herein stated, they could easily have been advised by application to Carneal, the trustee, or to Dongworth. This inquiry they did not make. The writing which was presented to them was made by their brother, ■and, so far as appears, they freely affixed their signatures and seals to it. And, in consequence of the order so drawn and executed, the hill-land was conveyed to Dongworth, and the *city lots to Archibald, and this by separate and distinct deeds of conveyance.
It is said that these complainants received no consideration for the execution of this order upon Carneal, and that therefore, under the circumstances of the case, they should not be bound by it. Whether they received any consideration or not, a sufficient consideration passed from Dongworth. Ho had been damnified by his indorsements for the elder Irwin to the amount of nearly twenty thousand dollars, and for his indemnity he had a lien not only *582 upon the hill-land but upon the city lots. This lien upon the city lots he relinquished, and also released his entire claim u|3on the estate of William Irwin. Ordinarily, I suppose that it may be considered that it is of some benefit to a child that a large claim against its father’s estate is released. Perhaps it is not so in this case, for it is said by complainants’ counsel, that the estate of the father was insolvent, and these complainants could expect nothing from the assets.
But there is another view which may be taken of this matter. There had been a controversy between Archibald Irwin and Long-worth, with respect to this property, from the death of William Irwin, in 1824, until 1839, each claiming that the deed to Carneal was in trust for his own benefit—a controversy which was well understood by these complainants. Terms of compromise had been proposed by Archibald, which were at first rejected by Longworth, but at length assented to by him, in consequence of the earnest solicitation of friends. Still the trustee refused to convey in pursuance of this compromise, unless with the assent of the heirs of William Irwin. That assent was given by these complainants, and this was supposed to be a close of this unpleasant business. Can it be doubted that when this order was signed by these complainants, they understood the purport and object of it? That the intention was to perfect a settlement between their brother and Long-worth ? Shall they now be permitted to avoid this act—to defeat this settlement, on the pretense that they received no consideration ?
*But I am wrong, perhaps, in intimating that they wish to defeat this' settlement. They are well satisfied that it should remain, so far as Archibald is concerned—that he should retain the property conveyed to him; although the gravamen of their complaint against Longworth is, that in drawing up the order, Archibald stated a falsehood, in saying the deed to Carneal was in trust for his use, to discharge the debts of William Irwin & Son. Admitting this to be a falsehood, which I do not believe, why should the sin of Archibald bo visited upon Longworth? It might be good ground of complaint against the fox'mer, and good ground to induce a court of chancery to decree that he should relinquish his hold upon the lots conveyed to him by Carneal. But so long as there was no mistake in this order, as to the trust in favor of Long-worth—so long as on his part there has been no misrepresentation, *583 no concealment, but a constant and uniform affirmation as to Ms rights—it does seem to me that it is not in accordance with the principles of equity and good conscience, to divest him of this property, or to subject him to any further altercation with respect to it.
Admitting that in the order referred to, there was such mistake as is alleged by these complainants, and they were ignorant of it, does it follow, as a matter of course, that they are entitled to the relief which they seek ? Courts of equity will, in a proper case, relieve against mistakes. But in order to entitle himself to relief, a complainant must not only establish the mistake, but he must show that this mistake has been prejudicial to him. Now how have these complainants been prejudiced by this alleged mistake ? There is no controversy but that Longworth had a lien upon the entire property deeded to Carncal, to indemnify him for his indorsements to the bank. About this there is no pretense of any mistake. The evidence in the case shows that the amount which he had been compelled to pay in consequence of these indorsements, together with the interest, amounted, in January, 1839, to very near twenty thousand dollars. This was a debt against the estate of William *Irwin, to 'say nothing about the debt to Archibald Irwin and debts to others. And this debt being a lien on the real estate, the heirs of William Irwin could not have the enjoyment of the estate but upon the payment of this debt. Such being the situation, Longworth, at the earnest solicitation of his friends, agreed to take for his debt, the hill-land, and relinquish his claim to the city lots. To this the complainants, as two of the heirs of William Irwin, agreed, and directed the hill-land to be conveyed to Longworth—which was done; and he discharged or released the estate of William Irwin, from all claims or demands which he had against it. The hill-land was by him received in full satisfaction of what he had been compelled to j>ay on tho bank indorsements. It was received as full indemnity, and being so received, his lien upon the city lots was entirely removed. This is the plain, common-sense nature of the transaction. The fact that these complainants assented that the city lots should bo conveyed to their brother, or the fact that they now consent that that brother shall retain them as his property, although they insist that he has no right to them whatever, can not affect Longworth or his interests.
*584 Now, was this arrangement advantageous or prejudicial to the complainants and other heirs of William Irwin ? This must depend upon the value of the property received by Longworth, in satisfaction of his debt. As heretofore stated, the testimony as to its value in January, 1839, is somewhat conflicting; but taking the testimony altogether, I am satisfied that its value did not exceed fifteen thousand dollars, and do not believe that it could have been sold in the market for ton thousand. In fact, I very much doubt whether the entire property covered by the deed of trust, could have been sold for a sum sufficient to satisfy Longworth’s debt. If I am right in this, it follows that this arrangement—even admitting it to have been assented to by complainants, under a mistaken view of their rights—was not prejudicial to them. On the contrary, it was advantageous to them. That is, it was advantageous to them, if to pay a debt *of twenty thousand dollars with property of less value than fifteen thousand, can be said to be advantageous to the debtor.
It is said by counsel for eqmplainants that, by a decree against Longworth, no wrong is done to him, as he will, in that event, receive what is justly his due, in consequence of payments made by him on his indorsements. This is, in a certain sense, true; and it would, in the same sense, be true, that no wrong would be done to a vendee of land, by a decree against him to reconvoy, uj)on the repayment of the purchase money and interest by the vendor. As the case now stands, Longworth must he treated as a purchaser, not as a mortgagee, and like any other purchaser, is entitled to the benefit of the increased value of the property, if there has been any such increased value. That there has been, is abundantly manifest from the whole case, and hence this litigation. Had the value of the property remained as in January, Í839, this court would never have been troubled by these complainants with a bill to redeem. It is the enhanced value of the property which alone. gives importance to the cases. But in deciding the cases, this court is bound to look upon the property according to its value in 1839, not in 1844 or 1852.
It is further urged by counsel for complainants, that, under the circumstances attending the conveyances from Carneal to Long-worth and Archibald Irwin, the only legitimate effect of those conveyances was to transfer the legal estate to the grantees, subject to the same trusts which were-attached to it in the hands of Carneal *585 himself; in other words, that there was a mere devolution of trust. At least, such is the claim so far as relates to the property conveyed to Longworth. As to that conveyed to Irwin, the complainants take no interest in it.
If this court abide by the principle, that the intention of parties in the transaction of business, so far as the same can be collected from their written or parol declarations, or by their actions, shall govern, here was certainly no devolution of trust. No such thing .entered the minds of the parties. The complainants knew that the legal title to the hill-land and city lots was in Carneal. They know that it was claimed by their brother *that Carneal held the title in trust to his use, for a particular purpose. They knew that Longworth claimed that it was holden in trust for his indemnity. They knew that, upon this subject, there had been a controversy between the two of many years’ standing. These things they certainly know, whether they were actually acquainted with the merits of this controversy or not. And when the order or memorandum of January, 1839, was presented to them for their signature, they must have known or believed that this long existing controversy had been compromised between the parties, by an agreement to divide the land. Possessing this knowledge, they signed the order, thereby directing Carneal to convey the hill-land to Longworth, and the city lots to their brother. Was it their intention that Longworth and their brother should hold these lands merely as trustees, or that they should hold them as their own absolute property ? Theje can be no doubt that the latter was the intention.
When we look to the conduct of the two grantees, we find that each one of them, upon the reception of his deed, discharged the estate of William Irwin from all claims which they had against the estate, and the claims thus discharged constituted the consideration by them paid for the land.
Under such circumstances, it seems to me, it will not do to say, here was a mere devolution of trust.
Upon the whole case, so far as the complainants in the original bill are concerned, I am not satisfied that they are entitled to any relief, but, on the contrary, am of opinion the bill should have been dismissed. And I am led to this conclusion by a variety of considerations. I am satisfied that in the conveyance of the property to Carneal, William Irwin designed to put it beyond the reach *586 of creditors, and to place it in a situation that Archibald could have the use of it, or appropriate it to pay off the debts of William Irwin & Son; that this was well understood by the trustee and by Dongworth; but lest on this account the deed should be deemed fraudulent, the trust for the indemnity of Dongworth was inserted, but inserted with *the understanding that Dongworth might or might not, at his election, insist upon its enforcement. There was, in substance, a trust for the benefit of Archibald Irwin, but it rested in parol, and therefore could not be enforced. The recital in the written order of January, 1839, that the property was conveyed to Carneal, in trust, “ for the use of Archibald Irwin, to pay the debts,” etc., instead of being false, as alleged jn the bill and in the arguments of counsel, is substantially true. But if it was not true, and the complainants acted under a mistaken apprehension in supposing it to be true, the facts with which they were acquainted, and even the order itself, were sufficient to put them upon inquiry, and if they proceeded to act without making inquiry, they can not avoid this action upon the pretense that they acted in ignorance. If there was a mistake in the order as to the trust in favor of Archibald, there was no mistake so far as the trust in favor of Dong-worth ' is concerned. He had practiced no deception, no fraud upon these complainants; and if they have been deceived by their brother, Dongworth ought not to suffer in consequence. Admitting a mistake, and admitting that in consequence of this mistake the complainants acted under a misapprehension, still they are not entitled to relief, because this action was not prejudicial to them; as the only effect of it was to pay a debt due from their father’s estate, of nearly twenty thousand dollars, with property of less value than fifteen thousand.
It may be proper to say that a case is referred to by counsel, and is cited by the court in this case, to sustain its decision in 10 Howard’s Reports. An examination of that case will show that the party against whom relief was sought, had been guilty of the most palpable fraud, and it was on this ground relief was granted. In this case there is no pretense of any fraud on the part of Dong-worth.
As it respects the complainants in the cross-bill, they stand in a different situation from the complainants in the original bill. They were infants at the time of the execution of the order before referred to, and of the deeds to Dongworth and * Archibald *587 Irwin. They never assented to that order, although it was signed by their father. I incline to the opinion that they are entitled to relief, unless precluded from present relief by the fact that their father had an interest in the land as tenant by the courtesy. If, as insisted by complainants’ counsel, this deed to Carneal is to be considered as an ordinary mortgage; and an equity of redemption, technically speaking, remained in William Irwin, and descended-to his heirs, then Lewis Whiteman had an interest. But I am not entirely satisfied of the soundness of the argument upon this subject. However, it will be of no use to enter into a particular examination of the matter; and I shall not do it.